*This opinion is subject to revision before final publication in the Pacific Reporter*

**2017 UT 73**

IN THE

## SUPREME COURT OF THE STATE OF UTAH

DEREK DIRCKS and VALERIE DIRCKS,
*Appellants,*

*v.*

THE TRAVELERS INDEMNITY COMPANY OF AMERICA,
*Appellee.*

No. 20160065
Filed October 17, 2017

On certification from the
United States District Court for the District of Utah
The Honorable Jill N. Parrish
No. 2:14-cv-00118

Attorneys:

Brian S. Coutts, Scott D. Brown, Tyler Brown, Midvale, for appellants

Beth E. Kennedy, Michael D. Zimmerman, Troy L. Booher, Nicholas E. Dudoich, Paul M. Belnap, Salt Lake City, for appellee

ASSOCIATE CHIEF JUSTICE LEE authored the opinion of the Court, in which CHIEF JUSTICE DURRANT, and JUSTICE DURHAM joined.
JUSTICE HIMONAS filed a dissenting opinion, in which JUSTICE PEARCE joined.

ASSOCIATE CHIEF JUSTICE LEE, opinion of the Court:

¶ 1    This case is before us on a certified question from the federal district court. We are asked to examine the terms of Utah Code section 31A-22-305.3. The question presented is whether this provision requires that all vehicles covered under the liability provisions of an automobile insurance policy must also be covered under the underinsured motorist provisions of that policy, and with equal coverage limits. We conclude

that it does, unless a named insured waives the coverage by signing an acknowledgment form meeting certain statutory requirements.

I

¶ 2   On July 11, 2012, Derek Dircks and Michael Riley suffered injuries in a car accident caused by another driver. Both Dircks and Riley were employees of Mid-State Consultants, Inc. They were in Riley's personal vehicle on an assignment for Mid-State at the time of the accident.

¶ 3   To cover his resulting medical bills, Dircks and his wife sought and received liability benefits under the third-party driver's automobile insurance policy, as well as underinsured motorist benefits under Riley's policy. But the amounts received were insufficient to cover the bills. So Dircks sought additional underinsured motorist benefits under Mid-State's commercial insurance policy with Travelers Indemnity Company of America. The policy included $1 million of liability coverage for persons driving in either a Mid-State fleet vehicle listed in the insurance policy or a vehicle owned by a Mid-State employee when used for Mid-State business.[1] The policy also included $1 million of underinsured motorist coverage. And it purported to limit this coverage to persons driving in Mid-State fleet vehicles.[2]

¶ 4   Travelers denied Dircks' claim on the ground that Mid-State's policy did not provide underinsured motorist coverage for Riley's vehicle. Dircks subsequently filed suit. After the parties filed cross-motions for summary judgment, the federal district court certified to us the question of whether state law requires that all vehicles for which

---

[1] The policy contains a chart listing the type of coverage in one column, the associated "covered auto symbol" in the second column, and the limits of insurance in a third column. For liability coverage, the correlating auto symbol is "1," which is described several pages later as "any auto." We do not here determine how broadly to interpret the "any auto" language because the parties agree that it encompasses at least listed Mid-State fleet vehicles and vehicles owned by Mid-State employees when used for Mid-State business.

[2] For underinsured motorist coverage, the correlating auto symbol in the policy is "2," signifying coverage for "Owned 'Autos' Only."

Mid-State had purchased liability coverage be covered to the same extent under Mid-State's underinsured motorist coverage.

## II

¶ 5    The Utah code requires "every resident owner of a motor vehicle" to "maintain owner's or operator's security in effect at any time that the motor vehicle is operated on a highway or on a quasi-public road or parking area within the state." UTAH CODE § 41-12a-301(2)(a). Proof of such security may be provided by a "certificate of insurance under Section 41-12a-402 or 41-12a-403." *Id.* § 41-12a-401(1)(a). By statute, "[e]very policy of insurance or combination of policies purchased to satisfy the owner's or operator's security requirement" must include four specific types of insurance: "(a) motor vehicle liability coverage under Sections 31A-22-303 and 31A-22-304; (b) uninsured motorist coverage under Section 31A-22-305, unless affirmatively waived under Subsection 31A-22-305(5); (c) underinsured motorist coverage under Section 31A-22-305.3, unless affirmatively waived under Subsection 31A-22-305.3(3); and (d) except as provided in Subsection (2) and subject to Subsection (4), personal injury protection under Sections 31A-22-306 through 31A-22-309." *Id.* § 31A-22-302(1).

¶ 6    This case concerns the required terms and scope of underinsured motorist coverage in a policy purchased to satisfy a vehicle owner's insurance requirements. The key operative provision is Utah Code section 31A-22-305.3. Section 305.3 states that "[u]nderinsured motorist coverage under Subsection 31A-22-302(1)(c) provides coverage for a *covered person* who is legally entitled to recover damages from an owner or operator of an underinsured motor vehicle because of bodily injury, sickness, disease, or death." *Id.* § 31A-22-305.3(2)(a) (emphasis added). *Covered person*, in turn, is defined to include "any person occupying or using a motor vehicle referred to in the policy." *Id.* § 31A-22-305(1)(d); *id.* § 31A-22-305.3(1)(a). And section 305.3 mandates that "the limits of underinsured motorist coverage shall be equal to the lesser of the limits of the named insured's motor vehicle liability coverage or the maximum underinsured motorist coverage limits available by the insurer under the named insured's motor vehicle policy" unless the named insured signs an acknowledgment electing "coverage in a lesser amount." *Id.* § 31A-22-305.3(3)(b).

¶ 7    The parties offer differing views of the implications of these provisions. Dircks interprets them to mandate parallelism between underinsured motorist coverage and liability coverage within the same

policy—both in terms of the persons and vehicles covered and the liability limits. And Dircks claims that he is entitled to underinsured coverage in the underlying case because Mid-State never signed an acknowledgment limiting its underinsured motorist coverage.

¶ 8    Travelers offers two grounds for rejecting Dircks' approach. First it says that section 305.3 does not apply to vehicles that Mid-State had no statutory obligation to insure (like those not owned by Mid-State). And second Travelers asserts that the Mid-State policy properly excludes the unowned vehicles in question from coverage for underinsured motorist purposes.

¶ 9    We reject both of Travelers' arguments and generally agree with Dircks' conception of the statutory scheme.

A

¶ 10    Travelers first seeks to avoid any application of section 305.3 to vehicles not owned by Mid-State. It notes that this provision is addressed to "[u]nderinsured motorist coverage *under Subsection 31A-22-302(1)(c)*." UTAH CODE § 31A-22-305.3(2)(a) (emphasis added). And it indicates that section 302, in turn, speaks of insurance "purchased to satisfy the owner's or operator's security requirement of Section 41-12a-301." *Id.* § 31A-22-302(1).

¶ 11 Travelers emphasizes that Mid-State did not own Riley's vehicle. And it insists that it accordingly had no obligation to insure that vehicle under section 302. In Travelers' view, it follows that section 305.3 does not apply to the underinsured motorist provisions of the Mid-State policy because those provisions were not "purchased to satisfy" a statutory "security requirement" under section 302.

¶ 12 We disagree. Travelers' threshold point is correct. Mid-State had no legal duty to purchase any insurance for unowned vehicles.[3] But it does not follow that section 305.3 does not apply to the insurance policy in question. Section 305.3 applies to any "*policy* . . . purchased to satisfy the owner's or operator's security requirement." *Id.* § 31A-22-

---

[3] *See* UTAH CODE § 41-12a-301(2)(a) (stating that "every resident *owner* of a motor vehicle shall maintain owner's or operator's security in effect at any time that the motor vehicle is operated on a highway or on a quasi-public road or parking area within the state") (emphasis added).

302(1) (emphasis added). And the applicability of section 305.3 accordingly turns entirely on the scope of the term *policy* in section 302. For Travelers to succeed, we must read the term narrowly to encompass only the specific insurance *coverage* in a policy that is purchased to satisfy the security obligation. But there is nothing in the text that indicates the statute applies only to those *portions* of a policy.

¶ 13 A "policy" is "[a] document containing a contract of insurance." *Policy*, BLACK'S LAW DICTIONARY (9th ed. 2009). And the insurance document at issue in this case is clearly identified as a single policy. It is labeled with a single policy number throughout.[4] There is even a section in the document that allows the insurance provider to list "supplemental policies," which are each "a separate *policy* containing its complete provisions." (Emphasis added). But that section was left entirely blank.

¶ 14 That indicates that the Travelers policy in question was a "policy . . . purchased to satisfy the owner's or operator's security requirement." UTAH CODE § 31A-22-302(1). And that conclusion defeats Travelers' first argument. For that reason we conclude that section 305.3 applies to the entire insurance document understood as a "policy" even if some of the provisions in the policy were not themselves purchased to satisfy the insured's statutory security requirement.

¶ 15 In so holding we also reject the dissent's contrary arguments. First, we see nothing "senseless" about the statutory scheme as interpreted herein. *See infra* ¶ 40. This statutory framework promotes transparency. It does so by requiring insurers to offer *either* two separate insurance policies (one that satisfies the insurance requirements and an additional policy for excess insurance) *or* a single policy that includes an acknowledgement that excess coverage within the policy does not get the full benefits of the insurance code. That provides clarity for policyholders. And it protects consumers from being misled or confused by insurance companies—who stand in a position of great power because consumers have no choice but to come to them to purchase a policy to satisfy the requirements articulated in section 41-12a-301.

---

[4] The insurance contract identifies the document as "A Custom Insurance Policy Prepared for: Mid-State Consultants Inc."

¶ 16 Perhaps it is true that "sophisticated consumers" are those most likely to be protected by the statute as structured. *See infra* ¶ 51. But we see no reason to deem such consumers to fall beyond the legislature's reach. Even sophisticated consumers are at the mercy of insurance providers. And these consumers—like insurance companies themselves—are entitled to a fair construction of our statutory scheme.

¶ 17 Second, unlike the dissent we do not find ambiguity in the terms of the statute. Justice Himonas asserts that the reference to a "policy or combination of policies purchased to satisfy the owner's or operator's security requirement," UTAH CODE § 31A-22-302, could be understood to mean either of two things: (a) a "policy or combination of policies [*in whole or in part*] purchased to satisfy the owner's or operator's security requirement"; or (b) a "policy or combination of policies [*to the extent they are*] purchased to satisfy the owner's or operator's security requirement." *Infra* ¶ 48. And the dissent insists that either of these readings would add a "substantive term[]" to the statute. *Infra* ¶ 50.

¶ 18 But that is not correct. The "in whole or in part" formulation doesn't add a substantive term. It reinforces the plain language of the statute. A policy that is purchased "in part" to satisfy an owner's or operator's security requirement is one that is "purchased to satisfy" the security requirement. The same goes for a policy that is purchased "in whole" to do so. The "purchased to satisfy" modifier, in other words, encompasses any and all policies that are purchased *even in part* to satisfy the security requirement.

¶ 19 This is not "*ipse dixit*." *See infra* ¶ 45. It is a conclusion that follows from the natural meaning of the statutory text as we understand it. Section 302 regulates at the "policy" level (not the insurance coverage level).[5] And it applies to any "*policy* . . . purchased to satisfy the owner's or operator's security requirement." UTAH CODE § 31A-22-302 (emphasis added). The operative question, then, is whether the particular policy in question is one that was "purchased to

---

[5] Justice Himonas correctly notes that section 302 "regulates at the level of any 'policy or combination of policies.'" *Infra* ¶ 48. But this is still not the regulation of *insurance coverage* but of *policies*. And the extension to the plural—*policies*—is of no use to the dissent (or to Travelers) in any event because Mid-State purchased a single policy and not a combination of policies.

satisfy" the statutory requirement. This is a binary question. Either the policy was purchased to satisfy a security requirement or it was not. And we see no way to classify a policy that is necessary to satisfy statutory security requirements as one that was *not* purchased to satisfy those requirements. The fact that the policy does *more* than just satisfy those requirements does not mean that it was *not* "purchased to satisfy the owner's or operator's security requirement." It just means that it was *also* purchased for other reasons.[6]

¶ 20   That conclusion is reinforced by our analysis in *Arredondo v. Avis Rent A Car System, Inc.*, 2001 UT 29, 24 P.3d 928. In *Arredondo* we interpreted parallel language in Utah Code section 31A-22-302, which required "personal injury protection" for "[e]very policy of insurance . . . purchased to satisfy the owner's or operator's security requirement of Section 41-12a-301." *Id.* ¶ 9. The question in *Arredondo* was whether this provision was limited only to the "primary" policy expressly fulfilling statutory security requirements or also applied to a separate policy providing "excess" or "additional" coverage. *Id.* ¶ 16. We held that "excess" or "additional" coverage policies were not properly understood as "purchased to satisfy" statutory security requirements— only "primary" policies counted. *Id.* And we based that holding on an inquiry into whether the policy was necessary to fulfill the statutory requirements.

¶ 21   Under *Arredondo* a "primary" policy is understood as being "purchased to satisfy" statutory security requirements because the policy is "designed to meet the statutory security requirement." *Id.* ¶ 15. An "excess" policy, on the other hand, is not "purchased to satisfy" the statute because it is "unnecessary" to fulfill "those requirements." *Id.* ¶ 16. The key question, then, is whether the policy in question is "necessary" to fulfill the requirements of the statute. If a policy is necessary to meet the requirements of the code then it was

---

[6] The dissent's cited cases are distinguishable on this basis. Some statutory references to "purpose" may well leave an ambiguity as to the scope of this term. *See infra* ¶ 46 n.11. But section 302 does not speak of "purpose" in so many words; and it leaves no ambiguity as to its operative terms: A policy that is necessary to satisfy statutory security requirements was surely "purchased" to satisfy those requirements— even if it was also "purchased" to fulfill other needs.

purchased to satisfy those legal requirements. If not, the policy was not purchased to satisfy the statute.

¶ 22   That forecloses the dissent's alternative reading of the statute. The policy in question is one that was "purchased to satisfy" statutory security requirements because it was necessary to satisfy those requirements. The policy, moreover, did not cease to be "purchased to satisfy" the statutory requirements merely because it also furthered other purposes.

¶ 23   For that reason the dissent's first formulation does not add a substantive term to the statute. A policy that is necessary to fulfill statutory security requirements is already understood to have been "purchased to satisfy" those requirements—the "in whole or in part" qualifier is unnecessary. The dissent's second formulation does add a substantive term, however. There is no way to read the statutory text, without more, to apply only "to the extent" that a policy is purchased to satisfy statutory security requirements. And we reject the dissent's approach on that basis—reiterating our reluctance to infer substantive terms that are not set forth on the face of a statute.

B

¶ 24   Travelers' second argument accepts the general applicability of section 305.3 but claims that the unowned vehicles in question were properly excluded from underinsured motorist coverage in this policy. In Travelers' view, a vehicle is eligible for underinsured motorist coverage only if it is referred to *in the underinsured motorist provisions* of an insurance policy. Because the underinsured motorist provisions of its policy do not *refer to* employee-owned vehicles (but only Mid-State-owned fleet vehicles), Travelers says that persons who use or occupy those vehicles are not eligible for underinsured motorist coverage under the policy.

¶ 25   Again we disagree. By statute any person occupying or using a motor vehicle "referred to in the [automobile insurance] policy" is a "covered person" for underinsured motorist purposes. UTAH CODE § 31A-22-305(1)(d)(i); *id.* § 31A-22-305.3(1)(a);. There is no question, moreover, that the vehicle in question is "referred to" in the Travelers "policy"—in the portions of the policy providing for liability coverage. And that is sufficient to trigger the coverage terms of section 305.3.

¶ 26   Section 305.3 sweeps broadly. It regulates underinsured motorist coverage for any vehicle "referred to *in the policy*." *Id.* § 31A-22-305(1)(d)(i) (emphasis added); *id.* § 31A-22-305.3(1)(a). And there is

no question that unowned vehicles are referred to in the Travelers *policy*. *See supra* ¶¶ 11–14 (noting that "policy" means the entire insurance document).

¶ 27 The reference to unowned vehicles, granted, is not in the underinsured motorist coverage provisions of the policy. But coverage for purposes of section 305.3 is triggered by a reference *in the policy*. And we would be altering the statutory terms of coverage if we read that to require a reference *in the underinsured motorist provisions* of the policy. *See Arredondo*, 2001 UT 29, ¶ 12 (refusing to read "substantive terms into the text that are not already there") (citation omitted).

¶ 28 That conclusion is reinforced by a distinction between the statutory coverage provisions for the two types of insurance at issue (underinsured motorist coverage and liability coverage). Underinsured motorist coverage, as noted, extends to any person occupying or using a vehicle "referred to in the policy." UTAH CODE § 31A-22-305(1)(d)(i); *id.* § 31A-22-305.3(1)(a). Yet liability coverage is different. By statute, "a policy of motor vehicle liability coverage under Subsection 31A-22-302(1)(a)" must "designate by appropriate reference all the motor vehicles on which [liability] coverage is granted." *Id.* § 31A-22-303(1)(a)(ii)(A). Thus, liability insurance extends only to vehicles "designate[d]" for liability "coverage," *id.*, while underinsured motorist insurance extends to any vehicle "referred to in the policy," *id.* § 31A-22-305.3(1)(a). And we cannot ignore the difference in statutory coverage terms.

¶ 29 Where two statutory provisions regulate the same subject matter but use different language, the implication is that the language difference is material. ANTONIN SCALIA & BRYAN A GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 170 (2012) ("[A] material variation in terms suggests a variation in meaning."). That canon defeats Travelers' argument. The code requires an express "designat[ion]" of a vehicle meant for liability coverage, UTAH CODE § 31A-22-303(1)(a)(ii)(A), but imposes no such requirement for underinsured motorist coverage. From that we can infer that there is no requirement of express designation of a vehicle for underinsured motorist purposes.

¶ 30 For these reasons we read section 305.3 to call for underinsured motorist coverage for any person occupying or using a vehicle "referred to" in the policy—even if that vehicle is not expressly designated as subject to underinsured motorist coverage. Under our

reading of the statute, a person using or occupying a vehicle covered by the liability provisions of a policy is also entitled to underinsured motorist coverage.[7] And she is entitled to equal limits for both types of coverage unless she signs a formal acknowledgment waiving that right. *Id.* § 31A-22-305.3(3)(b) ("[T]he limits of underinsured motorist coverage shall be equal to . . . the limits of the named insured's motor vehicle liability coverage . . . unless a named insured rejects or purchases coverage in a lesser amount by signing an acknowledgment form.").

## III

¶ 31 For the above reasons we answer the certified question in the affirmative. We conclude that any vehicle—whether owned by the policyholder or not—that is covered by a policy's liability insurance is also subject to underinsured motorist coverage under section 305.3. Thus, we hold that section 305.3 requires that any person occupying or using such a vehicle must also be covered by underinsured motorist insurance (and to the same policy limits) unless the coverage is waived by a formal acknowledgment.

---

[7] This is not to say that the *terms* of liability coverage will be identical to the terms of underinsured motorist coverage. Liability coverage extends universally to the named insured driving any vehicle. UTAH CODE § 31A-22-303(1)(a). Yet section 305.3 forbids underinsured motorist coverage for a named insured who is "occupying or using a motor vehicle owned, leased, or furnished" to the insured, unless "the motor vehicle is described in the policy under which a claim is made." *Id..* § 31A-22-305.3(2)(b). So where a named insured owns two vehicles and purchases insurance to satisfy her security requirements for just one of those vehicles, she would be entitled to liability coverage under the policy if she were to cause an accident while driving the second (unlisted) vehicle. But she would not be entitled to underinsured motorist coverage if, while using the second vehicle, she were injured by another driver. In that sense, a person may be covered by an automobile insurance policy for liability purposes but not for underinsured motorist purposes.

JUSTICE HIMONAS, dissenting:

**INTRODUCTION**

¶ 32 The legislature has established a comprehensive statutory framework requiring every car on the road to be adequately insured. To accomplish the end of *insuring* every car, the statutory provisions require vehicle owners to maintain automobile insurance on the cars they own. *See* UTAH CODE § 41-12a-301(2)(a) ("[E]very resident owner of a motor vehicle shall maintain owner's or operator's security in effect at any time that the motor vehicle is operated on a highway or on a quasi-public road or parking area within the state[.]"). And to make sure that every car is *adequately* insured, it provides for default coverage — some of it (such as liability insurance) mandatory and some of it (such as underinsured motorist coverage) waivable — that must be included in any insurance "policy . . . purchased to satisfy the owner's or operator's security requirement." *Id.* § 31A-22-302(1). Of particular relevance to this case, the legislature has provided that when a vehicle owner purchases liability insurance with a particular policy limit, the vehicle owner's automobile insurance policy will, by operation of law, also include the same dollar amount of underinsured motorist insurance unless the purchaser takes affirmative steps to validly waive that coverage. *Id.* § 31A-22-305.3(3)(b).

¶ 33 The members of this court all agree that when you purchase an insurance policy for vehicles you own — i.e., when you purchase a policy "to satisfy the owner's or operator's security requirement" — that insurance must comply with the default coverage requirements contained in chapter 22 of title 31A of the automobile insurance code. *Id.* § 31A-22-302(1) (setting forth the coverage requirements for "[e]very policy of insurance or combination of policies purchased to satisfy the owner's or operator's security requirement"). And the court is also of one mind that if you purchase an automobile insurance policy only for vehicles you *do not* own, that insurance need not comply with the automobile insurance law's default coverage requirements. *See Arredondo v. Avis Rent A Car Sys., Inc.*, 2001 UT 29, ¶ 14, 24 P.3d 928 ("Whether a policy or combination of policies was '*purchased to satisfy* the owner's or operator's security requirement' . . . hinges not on whether it actually satisfies the statutory security requirement, but rather whether it was *purchased for the purpose of satisfying* the statutory security requirement." (emphases in original) (citation omitted)).

¶ 34  This appeal presents a middle case: What happens if you are one of those few insurance purchasers who purchase insurance for vehicles you own and at *the same time,* and in *the same policy document*, also purchase insurance for certain vehicles you do not own (vehicles that, because they are owned by somebody else, must already have basic insurance)? These insurance purchasers will almost invariably be sophisticated businesses purchasing liability insurance on additional vehicles in order to minimize their vicarious liability. But the majority thinks this is the anomalous circumstance in which the automobile insurance law's default coverage requirements apply to insurance policies purchased for vehicles not owned by the purchaser. Because this contravenes the relevant statutory provisions and makes no sense, I respectfully dissent.

## BACKGROUND

¶ 35  On November 30, 2011, The Travelers Indemnity Company of America issued automobile insurance to Mid-State Consultants, Inc. so that Mid-State could "satisfy [its] owner's or operator's security requirement" for company-owned vehicles. UTAH CODE § 31A-22-302(1). In addition to this owner's insurance, however, Travelers also sold Mid-State liability insurance for certain vehicles it did not own—personal vehicles of its employees when those vehicles were being used for company business. The policy Mid-State purchased for its own vehicles included (1) $1 million of liability coverage and (2) $1 million of underinsured motorist coverage. But the policy Mid-State purchased for employee-owned vehicles—a policy that came in the form of an "endorsement" to the policy for Mid-State's own vehicles—only provided $1 million liability coverage for employee-owned vehicles. Mid-State did not purchase underinsured motorist coverage for the employee-owned vehicles.

¶ 36  After Derek Dircks was injured, he filed an underinsured-motorist claim with Travelers contending that, because Mid-State did not waive underinsured motorist coverage for employee-owned cars, Mid-State's policy included that coverage by operation of law. The majority agrees. It acknowledges that Mid-State "had no legal duty to purchase any insurance for unowned vehicles." *Supra* ¶ 12. And it does not dispute that, if Mid-State had purchased insurance for unowned vehicles in a separate policy document from the document containing insurance for the vehicles it did own, Utah Code section 31A-22-305.3 would not apply to that insurance. It nonetheless concludes that section

305.3 applies to the endorsement Mid-State purchased to cover employee-owned cars.

¶ 37   The majority hangs its hat on the word "policy" in Utah Code section 31A-22-302. According to section 302, the majority reasons, section 305.3 applies to any "*policy . . .* purchased to satisfy the owner's or operator's security requirement." *Supra* ¶ 12 (emphasis in original) (quoting UTAH CODE § 31A-22-302(1)). And when Mid-State purchased insurance for both company-owned and employee-owned cars, it purchased that insurance in a single "insurance document"—one that was "labeled with a single policy number throughout." *Supra* ¶ 13 ("A 'policy' is '[a] document containing a contract of insurance.'" (alteration in original) (quoting *policy*, BLACK'S LAW DICTIONARY (9th ed. 2009))). Accordingly, the insurance for both the company-owned cars and the employee-owned cars was part of the same "policy . . . purchased to satisfy the owner's or operator's security requirement." *Supra* ¶ 14 (quoting UTAH CODE § 31A-22-302(1)). To be sure, only the company-owned car insurance was actually "purchased to satisfy the owner's or operator's security requirement." But they were both in that same "policy." Per the majority, section 305.3 therefore applied to the insurance for both company-owned cars and the employee-owned cars. *Supra* ¶ 14. And section 305.3 provides that the employee-owned car insurance must include underinsured motorist coverage unless Mid-State validly waived that coverage—which it did not do. The fly in the majority's ointment is that its interpretation of "policy" does not square with a cohesive reading of all of the relevant provisions of our automobile insurance law.

## ANALYSIS

¶ 38   The point of our "owner's or operator's" vehicle insurance law is to make sure that every car on the road is adequately insured. To this end, it requires all automobile insurance owners to maintain "owner's or operator's security" on their automobiles. UTAH CODE § 41-12a-301(2)(a). It then sets forth some mandatory and default coverage provisions that must be included in all policies "purchased to satisfy the owner's or operator's security requirement" in this state. *Id.* § 31A-22-302(1). Sections 31A-22-303 and 304 state the required liability coverage contents and limits for a policy of motor vehicle liability coverage purchased to satisfy the owner's or operator's security requirement; section 305 sets forth the default uninsured motorist coverage terms that a policy purchased to satisfy the owner's or

operator's security requirement must include (unless waived); and section 305.3 sets forth the default underinsured motorist coverage terms that owner's or operator's insurance must contain (again, unless waived). I read this scheme to prescribe terms only for insurance you purchase on cars that you own. When you buy coverage for cars you do not own, the law governing terms for "owner's or operator's" insurance does not apply.

¶ 39 The majority rejects this reading. It concludes that when a company purchases insurance *both* to satisfy its "owner's or operator's security requirement" *and* to provide some coverage for employee-owned vehicles, whether the "owner's or operator's" insurance law prescribes terms of coverage for employee-owned vehicles depends on whether that insurance is included in a document with the same "policy number" as the document providing insurance for the company-owned cars. *Supra* ¶ 13.

¶ 40 I cannot countenance this interpretation. As counsel for the Dirckses admitted at oral argument, the majority's position means that whether Mid-State needs to affirmatively waive underinsured motorist coverage turns entirely on how Travelers chooses to label its policy documents. According to the majority's view, because Mid-State purchased insurance for company-owned and employee-owned cars in a document labeled with a single policy number, Mid-State needed to affirmatively waive underinsured motorist coverage. But had Mid-State gone to Travelers and purchased the same exact insurance contracts, except with the "endorsement" for employee-owned cars relabeled a "policy," the majority would conclude that it did not need to affirmatively waive underinsured motorist coverage. This contravenes the whole thrust of the statutory scheme—which is concerned not with regulating the labels an insurance company affixes to its policy documents, but rather with getting vehicle owners to adequately insure their cars. The majority's view does not even serve a general consumer protection purpose—such as protecting those insurance purchasers who buy two different kinds of automobile insurance at the same time—because insurance companies can circumvent the protections simply by relabeling a single form from an "endorsement" to a "policy." This is a task they could conceivably accomplish by simply assigning different policy numbers to different documents. It borders

on the senseless to let the outcome in this case be determined by how Travelers labeled its insurance instruments.[8]

¶ 41 I also reject the majority's interpretation because it seeds analytical confusion. Picture this: Mid-State buys liability coverage with $1 million limits for company-owned vehicles and with $500,000 limits for employee-owned vehicles. Then there would be two liability coverage limits in the same policy document. Under the majority's interpretation, to which one of these should we refer in determining the underinsured motorist coverage limits on employee-owned vehicles? The liability coverage policy with $500,000 limits—i.e., the one that, by the terms of the policy document, covers employee-owned vehicles? But that would mean that a set of statutes that only refers to liability coverage purchased to satisfy the owner's or operator's security requirement would *ignore* that liability coverage (i.e., the $1 million limit coverage), and their operation would instead turn on liability coverage of a kind that the automobile insurance statutes never mention or purport to govern. But if we were to decide that the $1 million liability coverage set the default limits for underinsured motorist coverage for employee-owned vehicles, then we would have to hold that the inclusion of liability coverage for employee-owned vehicles with $500,000 limits magically operates to cause different liability coverage that is concerned with a completely different set of cars to dictate the limits of underinsured motorist coverage on those

---

[8] The majority's response to this analysis is that the statute will "promote[] transparency" by "requiring insurers to offer *either* two separate insurance policies (one that satisfies the insurance requirements and an additional policy for excess insurance) *or* a single policy that includes an acknowledgment that excess coverage within the policy does not get the full benefits of the insurance code." *Supra* ¶ 15. But this is simply to restate a point I have just given reasons for rejecting. My conclusion remains untouched: where the distinction between "two separate insurance policies" and "a single policy" could be as subtle as the distinction between a document labeled (say) "BA-7511L495-12-GRP" and one labeled "BA-7511I495-12-GRP," the requirement that the majority reads into the statute will do little to promote transparency.

vehicles to which the $500,000 policy applies. Which is, if anything, even more outlandish.

¶ 42   The majority's opinion relies, in significant part, on the notion that when a particular statutory provision speaks clearly, we may not read "substantive terms into the text that are not already there." *Supra* ¶¶ 23, 27 (quoting *Arredondo v. Avis Rent A Car Sys., Inc.*, 2001 UT 29, ¶ 12, 24 P.3d 928). And it concludes that here we have a statute that could not be clearer: under Utah Code section 31A-22-302, section 305.3 applies to any *policy* purchased to satisfy the owner's or operator's security requirement—and it applies even "to those *portions* of a policy" that are entirely unrelated to the purpose of "satisfy[ing] the security obligation." *Supra* ¶ 12. When—as here—owner's or operator's insurance is in *the same policy* as insurance for unowned cars, section 305.3 therefore applies to the entire policy—no matter that the result distorts the statutory scheme and confuses the law.

¶ 43 I share the majority's general impulse against reading "substantive terms into the text that are not already there." *Supra* ¶ 27 (quoting *Arredondo*, 2001 UT 29, ¶ 12). I am concerned, however, that neither the *Arredondo* canon nor a wooden reliance on legal dictionaries helps solve the statutory problem in this case. Here, the legislature has told us that any policy "purchased to satisfy the owner's or operator's security requirement"—that is, any policy "*purchased for the purpose of satisfying* the statutory security requirement," *Arredondo*, 2001 UT 29, ¶ 14 (emphasis in original)—must include certain terms. UTAH CODE § 31A-22-302(1). And, by negative implication, it has told us that a policy need not include those provisions when it *is not* purchased for the purpose of satisfying the owner's or operator's security requirement. *See Masich v. U.S. Smelting, Ref. & Mining Co.*, 191 P.2d 612, 622 (Utah 1948) ("[B]y making compensation payable only in the event of total disability, [our law] clearly indicates an intent on the part of the legislature not to make compensation payable for partial disability."). But it has not told us what to do with a policy purchased *in part* "to satisfy the owner's or operator's security requirement," even though, sometimes, it tells us exactly how to classify something done *in part* to accomplish one goal and in part another. *See* UTAH CODE § 13-41-102(7) ("'Service' means any activity that is performed in whole or in part for the purpose of financial gain[.]"); *see also id.* § 20A-11-1501(1) ("'Labor organization' means a lawful organization of any kind that . . . exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or other terms and conditions of employment."); *id.* § 4-5-103(1)(c) ("A

food is adulterated . . . if it consists in whole or in part of a diseased, contaminated, filthy, putrid, or decomposed substance, or if it is otherwise unfit for food[.]").

¶ 44 Indeed, on a proper understanding of the interpretive problem this case presents, the canon cautioning against reading "substantive terms into the text that are not already there" is inapposite. *Arredondo*, 2001 UT 29, ¶ 12 (citation omitted). It does not solve the real interpretive problem before us. Nor does a plain meaning analysis of the word "policy." *Cf. supra* ¶¶ 12–14. The interpretive problem before us is not what a "policy" is. The problem is whether section 305.3 applies to a policy (or combination of policies) that is purchased *in part* to satisfy the owner's or operator's security requirement and *in part* for a different purpose—insuring employee-owned cars. The statutory language does not precisely speak to this issue. It says only that section 305.3 applies to any "policy of insurance or combination of policies purchased to satisfy the owner's or operator's security requirement." UTAH CODE § 31A-22-302(1). To reach the majority's result—that section 305.3 applies to a policy purchased in part to satisfy Mid-State's owner's or operator's security requirement and in part to cover employee-owned cars—we must conclude that section 302 applies section 305.3 to any "policy . . . or combination of policies purchased [*in whole or in part*] to satisfy the owner's or operator's security requirement." *Id.* This is, to be sure, *one* possible resolution of the statute's imprecision. But it is not *the only* possible resolution. Another possibility—the one I favor—holds that section 302 applies section 305.3 to any "policy . . . or combination of policies [*to the extent they are*] purchased to satisfy the owner's or operator's security requirement." *Id.*

¶ 45 In a paragraph of *ipse dixit*, the majority denies that the imprecision I have identified exists. According to the majority, these two sentences are equivalent: (1) "The statute applies to a policy or combination of policies purchased to satisfy the owner's or operator's security requirement" and (2) "The statute applies to a policy or combination of policies purchased *in whole or in part* to satisfy the owner's or operator's security requirement." *Supra* ¶ 18. In the majority's view, "[a] policy that is purchased 'in part' to satisfy an owner's or operator's security requirement is one that is 'purchased to

satisfy' the security requirement. The same goes for a policy that is purchased 'in whole' to do so." *Supra* ¶ 18.[9]

¶ 46 Of course, when a majority invokes the venerable *Draughon-Dumpty* doctrine—baldly declaring that an interpretation is beyond the linguistic pale—there is little the losing side can do.[10] I note, however, that many other courts would not have invoked that doctrine in this case.[11] If some of Utah sees no ambiguity and the rest of Utah (along

---

[9] The majority tells us that "[t]his is not *ipse dixit*," but is, instead, "a conclusion that follows from the natural meaning of the statutory text as we understand it." *Supra* ¶ 19. There is little distinction, and even less difference, between "it means x because I say so" and "x is its natural meaning as I understand it." "The majority deems its construction 'natural' . . . [b]ut that is just the majority judges' intuition speaking." *Oliver v. Utah Labor Comm'n*, 2017 UT 39, ¶ 68, —P.3d— (Lee, A.C.J., concurring in the judgment) (citation omitted).

[10] *See Draughon v. Dep't of Fin. Insts*, 1999 UT App 42, ¶ 11 n.4, 975 P.2d 935 ("'When I use a word,' Humpty Dumpty said in a rather scornful tone, 'it means just what I choose it to mean—nothing more nor less.' 'The question is,' said Alice, 'whether you can make words mean different things.' 'The question is,' said Humpty Dumpty, 'which is to be master—that's all.'" (quoting LEWIS CARROLL, THROUGH THE LOOKING GLASS AND WHAT ALICE FOUND THERE 123 (1941))).

[11] Many courts think "the purpose" is ambiguous between, for example, "the primary purpose" or "the sole purpose" or simply "a purpose"—an ambiguity that simply does not exist if "purchased for the purpose of satisfying the owner's or operator's security requirement" is equivalent to "purchased *in whole or in part*" for that purpose. *See, e.g.*, *United States v. LaRouche Campaign*, 695 F. Supp. 1265, 1272 (D. Mass. 1988) (Keeton, J.) ("If a statute is interpreted as requiring proof of purpose . . . that an act contribute to bringing about a defined event, a[n] . . . ambiguity remains. Does 'purpose' mean 'sole purpose,' or 'primary purpose,' or instead is the 'purpose' element satisfied if . . . [the purpose is] included as at least one of the . . . purposes (even if not the primary or dominant one) . . . ?"); *Waldie v. Schlesinger*, 509 F.2d 508, 510 n.1 (D.C. Cir. 1974) ("[W]hen affiants declare that the purpose of the Academies is to prepare men for combat, it is unclear whether they mean it is the sole purpose, the primary purpose, or merely a purpose. Plaintiffs' case hangs on resolution of such ambiguities, and plaintiffs

(cont.)

with Massachusetts, D.C. and Nevada) think otherwise, that disagreement itself is strong evidence that the ambiguity exists.

¶ 47 The majority has a couple of responses. First, it insists that there is no ambiguity because "[s]ection 302 regulates at the 'policy' level (not the insurance coverage level)." *Supra* ¶ 19. Thus, the majority argues, when a policy contains terms that are "necessary to satisfy the statutory security requirements," section 302 must apply to the entire policy. *Supra* ¶ 19.

¶ 48 This is not correct. Section 302 does not regulate at the "policy level"; it regulates at the level of any "policy or combination of policies purchased to satisfy the owner's or operator's security requirement." That is, therefore, the phrase we are tasked with interpreting. And to interpret that phrase, we need to ask ourselves which of the following two constructions makes better sense of our automobile insurance law: (1) section 302 regulates any policy or combination of policies purchased *in whole or in part* to satisfy the owner's or operator's security requirement or (2) section 302 regulates any policy or combination of policies *to the extent* purchased to satisfy the owner's or operator's security requirement.

¶ 49 Second, the majority suggests that *Arredondo*, 2001 UT 29, "forecloses [my] alternative reading of the statute." *Supra* ¶ 22; *see also supra* ¶¶ 20-21. I cannot for the life of me see how. In *Arredondo*, we explained that whether a policy or combination of policies was purchased to satisfy the owner's or operator's security requirement depends on the purpose for which the policy or combination of policies

---

should have the opportunity to resolve them in court."); *Nev. Tax Comm'n v. Nev. Cement Co.*, 36 P.3d 418, 422 (Nev. 2001) ("NRS 372.050's language, defining a taxable 'retail sale' as a sale of property *for any purpose* other than resale, could suggest a primary-purpose test as well a sole-purpose test. Similarly, NRS 372.080, exempting from taxation the keeping, retaining, or exercising power over property *for the purpose of* being processed, fabricated or manufactured into, attached to, or incorporated into, other tangible personal property, could suggest a sole-purpose test, a primary-purpose test, or a physical-ingredient test. Thus, these statutes are ambiguous, and we look to the legislature's intent, and construe them in line with what reason and public policy indicate." (emphases in original)).

was purchased, and that the automobile insurance law only operates to imply terms for policies purchased for the purpose of obtaining owner's or operator's security. *See Arredondo*, 2001 UT 29, ¶ 14 ("Whether a policy or combination of policies was '*purchased to satisfy* the owner's or operator's security requirement of [s]ection 41-12a-301' hinges not on whether it actually satisfies the statutory security requirement, but rather whether it was *purchased for the purpose of satisfying* the statutory security requirement."(citation omitted)). This case presents a related scenario: Mid-State purchased (1) a policy that satisfied its owner's or operator's security requirement and (2) an endorsement that has a separate purpose—providing liability coverage for certain vehicles Mid-State did not own. *Arredondo* tells us to focus on the purpose of these instruments. To the extent their purpose is to satisfy the owner's or operator's security requirement, *Arredondo* tells us that section 302 applies section 305.3 to them. *Arredondo* does not directly speak to whether section 302 applies section 305.3 to an endorsement to a policy whose purpose is not to satisfy the owner's or operator's security requirement, but it is certainly in keeping with *Arredondo*'s basic approach to conclude that it does not. *Arredondo* does not foreclose my alternative reading.

¶ 50 The upshot of this is that the phrase "section 302 applies section 305.3 to any 'policy or combination of policies purchased to satisfy the owner's or operator's security requirement" is, at minimum, ambiguous between (1) "section 302 applies section 305.3 to any 'policy or combination of policies purchased [*in whole or in part*] to satisfy the owner's or operator's security requirement'" and (2) "section 302 applies section 305.3 to any 'policy or combination of policies [*to the extent they are*] purchased to satisfy the owner's or operator's security requirement.'" *Supra* ¶¶ 44, 48. Properly framed, therefore, the interpretive problem is which of these two possible interpretations of section 302 is better. This question cannot be answered by recourse to the canon against reading substantive terms into the statutory text because both possible interpretations necessarily interpolate terms into that text. Instead, we must recur to the broader "linguistic, structural, and statutory context" in which this interpretive problem arises. *State v. Rushton*, 2017 UT 21, ¶ 11, 395 P.3d 92 (citation omitted).

¶ 51 For the reasons I have explained, I think my interpretation is the better one. It is supported by the statutory scheme as a whole—a scheme that is plainly aimed at regulating the contents of owner's or operator's insurance (not insurance on cars you don't own). *See supra* ¶ 38. It also avoids the mismatch between means and ends to which the

majority's interpretation gives rise—that is, it does not create a form of "consumer protection" (1) that applies only to those few, sophisticated consumers who purchase liability coverage on both their own cars and other people's cars at the same time and (2) that the insurance company can effortlessly circumvent by relabeling its insurance policy documents. *See supra* ¶ 40. And, finally, it avoids the analytical confusion that would flow from the majority's preferred interpretation. *See supra* ¶ 41.

## CONCLUSION

¶ 52 I am unpersuaded by the majority's interpretation. It misconstrues—and underestimates—the interpretive problem before us. It grafts ineffectual protections for a small sliver of the most sophisticated insurance consumers onto a statutory scheme that is otherwise effective at regulating the insurance that automobile owners must purchase for their own cars. And it unsettles the law by creating a situation in which an important legal question—which of two different liability policy limits should serve as the benchmark for underinsured motorist coverage limits—has no determinate answer.

¶ 53 I would hold that the automobile insurance laws at issue in this case govern only the terms of insurance policies purchased to satisfy the owner's or operator's security requirement. Because Mid-State did not purchase liability insurance on employee-owned cars in order to satisfy the owner's or operator's security requirement, section 305.3 does not apply to that insurance. Mid-State's Travelers insurance policy therefore did not include $1 million of underinsured motorist coverage for employee-owned cars, notwithstanding the fact that Mid-State did not affirmatively waive that coverage.